UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                -against-

RICHARD "ROB" WALKER,

                Defendant.
----------------------------------------------------------------------X

For Online Publication Only

**ORDER**
18-CR-087 (JMA)

FILED
CLERK
4/26/2019 4:38 pm
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**AZRACK, United States District Judge:**

Defendant has filed various pre-trial motions. For the reasons set forth below, those motions are denied. As to Defendant's Kastigar claim, the Court will hold a Kastigar hearing after trial, if necessary.

**A. Alleged Violations of the New York Code of Professional Responsibility**

Defendant asserts that certain conduct by the government violated the New York Code of Professional Responsibility. Specifically, Defendant contends that, prior to his indictment, a confidential informant and FBI agents spoke to him when the government knew that he was already represented by counsel. As a remedy, Defendant seeks dismissal of the indictment or, alternatively, suppression of his statements to the confidential informant and the FBI. For the reasons set forth below, these requests are denied.

1. **Factual Background**[1]

In October 2014, Defendant and a Nassau County contractor (the "Contractor") took a trip together to a football game at Notre Dame. (Gov't Ltr. at 2.) During that trip, the Contractor allegedly gave Defendant $5,000. (Id.) At the time, the Contractor was under federal investigation for tax violations and related crimes. (Id. at 3.) Two months after the alleged payment, the Contractor lost his contract with the County. (Def.'s Mem. at 3.)

Prior to making the alleged payment, the Contractor had proffered with the government in July 2014. (Gov't Ltr. at 3.) In February 2015, a few months after the alleged payment, the Contractor again proffered with the government. (Id.) The Contractor did not disclose the $5,000 payment at either of those proffer sessions. (Id.)

The government asserts that "[i]n relation to a separate and distinct investigation involving a fraudulent loan scheme in the Town of Oyster Bay, [Defendant] was issued a Grand Jury subpoena for records on or about October 1, 2015." (Gov't Ltr. at 4 n.2.) Defendant's attorney, Brian Griffin, accepted service of the subpoena on his behalf. (Id.) On October 15, 2015, Mr. Griffin responded to the subpoena for Defendant by sending the responsive documents along with a cover letter to AUSA Catherine Mirabile. (ECF No. 28-2). The record does not contain a copy of this subpoena. Nor does the record indicate what specific documents were sought by the subpoena.

███████████████████████████████████

███████████████████████████████████

---

[1] Defendant's motion papers include various factual representations that are not supported by any admissible evidence in the record. Defendant has not sought a hearing concerning this motion to suppress and, in any event, "the burden of production and persuasion generally rest upon the movant in a suppression hearing." United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980). Defendant's failure to provide admissible evidence in support of the factual allegations in his briefs is a sufficient reason to exclude, or at the very least, discount such allegations. And, even assuming arguendo that I should accept the factual representations in Defendant's briefs—at least some of which appear to be based on recordings made by the government—I find that none of those facts warrant suppression here.



On February 10, 2016, Mr. Griffin wrote a letter to AUSA Mirabile asking that Defendant be allowed to voluntarily surrender if any charges were filed against him.[4] (ECF No. 28-2.)

In July 2016, two grand jury subpoenas were issued to two companies controlled by the Contractor. The subpoenas were directed to the attention of the Contractor and another individual. (Subpoenas, ECF No. 28-2.) The subpoenas requested any documents "relating" to Defendant, and other individuals, "in their personal capacity." (Id.) The subpoenas directed the Contractor to testify before the grand jury, but indicated that, "in lieu of an appearance," the production records could satisfy the subpoena. (Id.) The Contractor ended up complying with

---

[4] Defendant's reply brief alleges, without any evidentiary support, that AUSAs Mirabile and Treinis-Gatz had unspecified conversations with Mr. Griffin about the Defendant in 2016 and 2017. (Def. Reply Mem. at 6, 12.) Even accepting these unsupported allegations, Defendant's reply brief provides no details about the substance of these conversations, particularly the content of any conversations that pre-date November 21, 2017 and which may be relevant to the instant motion.

the subpoenas by producing records and did not have to testify before the grand jury.  (Def. Mem. at 4.)

On July 14, 2017, the Contractor again proffered with the government and, for the first time, disclosed the alleged $5,000 payment to Defendant.  On or around August 21, 2017, "the government specifically instructed the Contractor to tell Walker that the Contractor had received a federal subpoena relating to Walker and others and to ask Walker about the $5,000 payment." (Gov't Ltr. at 3.)

Sometime later in August 2017, the Contractor contacted Defendant, "professing concern about a subpoena he claimed he had just received concerning the Notre Dame trip."  (Def. Mem. at 4.)  Defendant "engaged the [Contractor] in a conversation about what [the Contractor] . . . would say about the Notre Dame trip in preparation for his supposed grand jury testimony or subpoena compliance."  (Id. at 4; see also Def. Reply Mem. at 9 ("The [Contractor] professed . . . to have recently received a subpoena requiring him to appear before a grand jury to testify about the Notre Dame trip.").)  Defendant alleges, however, that no grand jury was actually convened to investigate the Notre Dame trip.  (Def. Mem. at 5.)

According to the government, between August 22, 2017 and October 25, 2017, the Contractor had numerous communications with Defendant in which Defendant attempted to impede the federal investigation "by inducing the Contractor to conceal the existence of, reasons for, and the character of the $5,000 payment."  (Gov't Ltr. at 3.)  During one meeting on September 6, 2017, "Walker gave the Contractor an envelope containing $5,000, intimating that, as a result, there was no need for the Contractor to mention the payment to law enforcement or the grand jury."  (Id.)

On November 16, 2017, two FBI agents attempted to interview Walker at his residence, but he was not home.  Later that day, Mr. Griffin left the following voicemail message for AUSA Lara Treinis-Gaz:

> Hello Lara, good morning, it's Brian Griffin calling, I hope you are well.  Lara, I'm calling regarding Robert Walker. . . he is away, but his neighbors informed him that early this morning there were some folks knocking on his door.  Based on the description, they sound like they might be friends of yours.  If you could give me a call back . . . I'd appreciate it.  Of course, I'll accept service of anything that needs to be served.  Thanks.  Bye.

(Gov't Ltr. at 9.)  AUSA Treinis-Gatz has no recollection of listening to this voicemail, and, thus did not inform others, including FBI agents or fellow AUSA Catherine Mirabile of its existence or its contents.  (Id. at 4, 9.)

On November 20, 2017, the FBI returned to Defendant's home to interview him.  (Id. at 4–5.)  The interview commenced at approximately 6:45 a.m. and lasted approximately 15 minutes.  (Id.)  At the outset of the interview, the FBI agents advised Defendant that they wanted to interview him about his relationship with the Contractor.  (Id.)  Defendant asked if he should contact an attorney and was advised that he was free to do so if he wished.  (Id.)  The FBI agents also advised him that the interview was voluntary and, if he chose to speak to the agents he could refuse to answer questions and could stop the interview completely at any time.  (Id.)  Defendant did not contact an attorney and agreed to be interviewed.  (Id.)  During the interview, Defendant denied that he had ever received money from the Contractor.  (Id.)  He then stated that he wanted to speak to his attorney, Mr. Griffin.  (Id.)

After Defendant asked to speak to his counsel, the agents advised Defendant that they were going to provide him with additional information to discuss with his attorney.  (Id.)  The FBI agents instructed Defendant that since he had requested counsel, he should make no statements about the materials shown to him, which were being provided solely to inform

5

Defendant's later conversations with his attorney.  (Id.)  Defendant acknowledged that he understood, and the agents read summaries of the text messages between Defendant and the Contractor and played a recorded conversation between Defendant and the Contractor.  (Id.)  According to the government, Defendant then made additional false statements to the agents.  (Id.)  During this stage of the interview, the FBI agents again reminded Defendant that he had requested counsel and twice advised him not to comment.  (Id. at 5.)

The government concedes that the FBI agents who interviewed Defendant were acting at the direction of the U.S. Attorney's Office.  (Id. at 9.)

On November 21, 2017, Mr. Griffin sent a letter to AUSAs Treinis-Gatz and Mirabile objecting to the government's conduct.  (ECF No. 28-2.)

In February 2018, Defendant was indicted.  These charges resulted "from an on-going investigation by [the FBI and the IRS] into whether public officials in Nassau County, including Walker, accepted payments from contractors with Nassau County and whether the individuals involved have obstructed justice and given false statements to federal law enforcement officials."  (ECF No. 28-2; see also Gov't Kastigar Br. at 1.).

**2.  Standard for Motion to Suppress Based on Violations of Disciplinary Rules**

Defendant argues that the government's use of the Contractor as a confidential informant and the FBI agents' interview both violated the New York Code of Professional Responsibility.

"An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."  28 U.S.C. § 530B.

The "no-contact" rule of New York's Code of Professional Responsibility, which was promulgated in 2009, states:

Communication With Person Represented By Counsel

(a) In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law.

N.Y. Rules of Prof'l Conduct 4.2(a), 22 N.Y.C. R.R. § 1200 ("Rule 4.2").[5]

In <u>United States v. Hammad</u>, 858 F.2d 834, 839 (2d Cir. 1988), the Second Circuit found that the government violated DR 7-104(A)(1) when, prior to the defendant's indictment, the prosecution had a confidential informant record the defendant and show the defendant a fictitious subpoena created by the prosecution.

DR 7-104(A)(1), the predecessor to Rule 4.2, similarly provided that:

A. During the course of his representation of a client a lawyer shall not:

1. Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

In <u>Hammad</u>, the Second Circuit recognized that "under DR 7–104(A)(1), a prosecutor is 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations, and the use of informants to gather evidence against a suspect will frequently fall within the ambit of such authorization." <u>Id.</u> at 840.  The <u>Hammad</u> court, however,

---

[5] Although New York did not adopt the comments to Model Rule of Professional Conduct 4.2, the New York State Bar Association has adopted a revised version of Comment 5 to Rule 4.2, which states:

> Communications authorized by law <u>may also include investigative activities of lawyers representing governmental entities, directly or through investigative agents</u>, prior to the commencement (as defined by law) of criminal or civil enforcement proceedings. . . . This Rule is not intended to effect any change in the scope of the anti-contact rule in criminal cases.

N.Y. Rules of Prof'l Conduct at 134–35, available at https://www.nysba.org/DownloadAsset.aspx?id=50671 (last visited on April 26, 2019.)

7

explained that "in some instances a government prosecutor may overstep the already broad powers of his office, and in so doing, violate the ethical precepts of DR 7–104(A)(1)," and found that the prosecutor's use of the fictitious subpoena was such a circumstance, "which contributed to the informant's becoming that alter ego of the prosecutor." Id.  The Hammad court "declined to list all possible situations that may violate DR 7–104(A)(1)," explaining that "[t]his delineation is best accomplished by case-by-case adjudication, particularly when ethical standards are involved." Id.

The Hammad court went on to find that suppression can be ordered as a remedy for a violation of this ethical rule, but ultimately declined to suppress the evidence at issue because "the law was previously unsettled in this area." Id. at 842.  The Second Circuit explained that, in future cases, "suppression may be ordered in the district court's discretion," and noted that the Circuit was confident that "district courts will exercise their discretion cautiously and with clear cognizance that suppression imposes a barrier between the finder of fact and the discovery of truth." Id. at 840, 842.

Subsequent to Hammad, the Second Circuit has stated that "the vague terms of DR 7-104(A)(1) should be construed narrowly in the interests of providing fair notice to those affected by the Rule and ensuring vigorous advocacy not only by defense counsel, but by prosecutors as well."[6]  Grievance Comm. for S. Dist. of New York v. Simels, 48 F.3d 640, 650 (2d Cir. 1995).

Since Hammad, the Second Circuit, "in considering an alleged violation of Rule 4.2, has not found government conduct to fall outside the "authorized by law" exception.  United States

---

[6] Although the decision in Hammad assumes that a person who is the target of a pre-indictment investigation qualifies as a "party" under the disciplinary rule, subsequent decisions, including, Grievance Comm. for S. Dist. of New York v. Simels, 48 F.3d 640, 647 (2d Cir. 1995), suggest that the reasoning in Hammad may be "untenable." In re Amgen Inc., No. 10-MC-0249, 2011 WL 2442047, at *12 (E.D.N.Y. Apr. 6, 2011), report and recommendation adopted, 2011 WL 2418815 (E.D.N.Y. June 14, 2011); see also id. at *10 n.17 (discussing proposed version of Rule 4.2 that would have used the term "person" instead of "party" and which was ultimately not adopted).

v. Binday, 804 F.3d 558, 593 (2d Cir. 2015).  Similarly, I have not located—and Defendant has not cited—any decisions from this Circuit post-Hammad that have suppressed evidence for a disciplinary rule violation.

### 3. Analysis

As explained below, I find that suppression is not warranted here.

#### i. The Communications between the Contractor and Defendant

The "pre-indictment, surreptitious recording by a [confidential informant] of a target known by the Government to be represented by counsel is 'authorized by law' as long as the Government does not engage in 'egregious misconduct.'"  United States v. Nouri, 611 F. Supp. 2d 380, 385 (S.D.N.Y. 2009).

Defendant contends that government's conduct was improper under Hammad because, despite the Contractor's statements to Defendant concerning the subpoena: (1) the Contractor actually received the subpoena in July 2016 and had already complied with subpoena prior to August 2017; (2) the subpoena permitted the production of documents in lieu of an appearance so the Contractor's appearance before the grand jury was not required; and (3) there was no grand jury investigating this transaction.  Defendant attempts to analogize the fictious subpoena in Hammad to the allegedly improper conduct here.

Defendant's arguments, however, fail on several grounds.  There was no egregious misconduct here; thus, the government's use of the Contractor as a confidential information was "authorized by law."  As an initial matter, there is no evidence that the government instructed the Contractor to say that he had "just received" the subpoena.  (See Gov't Ltr. at 3 (merely conceding that the "government specifically instructed the Contractor to tell Walker that the Contractor had received a federal subpoena relating to Walker" (emphasis added)).  And, even if

9

the government had so instructed the Contractor, that does not rise to the level of egregious misconduct that would warrant suppression. It is undisputed that the Contractor's companies had, in fact, received a subpoena that sought documents relating to Defendant. Any erroneous statements about the precise timing of such a subpoena are a far cry from the conduct in Hammad where a prosecutor gave the confidential informant a completely fabricated subpoena. Cf. Nouri, 611 F. Supp. 2d at 387–88 (noting that it was "doubtful" that a confidential informant's "reference to a nonexistent subpoena rose to the level of egregious misconduct" where the defendant had previously suggested that he wanted the informant to be subpoenaed so that the informant could tell "the story"). Moreover, contrary to Defendant's assertion, documents related to the Notre Dame trip were not outside the broad scope of the subpoena, which sought any documents relating to Defendant.

Relatedly, Defendant's claim that no grand jury was investigating this transaction also does not establish egregious misconduct. Defendant does not actually have any evidence to show that a grand jury was not investigating this transaction. More importantly, even if a grand jury was not investigating this specific transaction at the precise moment of the Contractor's discussions with the Defendant, a grand jury had previously inquired into Defendant's relationship with the Contractor when it subpoenaed the Contractor's companies in July 2016 and future investigation by the grand jury into this issue was likely. This situation is simply not analogous to the fabrication of a sham subpoena.

Defendant's arguments about the distinction between testifying in response to the subpoena and producing documents are also not persuasive. Again, there is no evidence that the prosecutors directed the Contractor to inform Defendant that the Contractor was required to testify before the grand jury. In any event, even if they did, any such statements about testifying

do not constitute egregious misconduct. The subpoena, on its face, sought testimony before the grand jury. Moreover, given that the Contractor had, in fact, received the subpoena at issue and had subsequently disclosed additional information to the government, there was also a reasonable prospect of the Contractor being called into the grand jury. The conduct of the Contractor and the government was well within the bounds of a proper investigation involving a confidential informant.

Defendant also argues that the government's conduct was improper and not authorized by law because the prosecutors allegedly manufactured an obstruction of justice charge when there was no underlying crime. The fact that the government did not ultimately charge Defendant with a bribery offense (or any other potential offenses, including the acceptance of unlawful gratuities under 18 U.S.C. § 666 or tax crimes related to the payment) is not dispositive and does not suggest egregious misconduct.[7] The government was not required to accept the Contractor's version of events surrounding the $5,000 payment without exhausting its investigation. Moreover, the fact that Defendant had accepted this suspicious payment from the Contractor gave the government ample reason to broadly investigate Defendant. In sum, the investigation here involved no egregious misconduct and was authorized by law. Moreover, even if the government's conduct did violate Rule 4.2, I would find, as a matter of discretion, that suppression is not warranted here.

### ii. The FBI Agents' Interview of Defendant

Defendant's argument that the FBI agents' conduct warrants suppression is similarly not persuasive. Both the specific facts of this case as well as the unsettled law in this area weigh

---

[7] "Federal-program bribery may be charged under either a bribery theory or a gratuity theory." United States v. Percoco, No. 16-CR-776, 2019 WL 493962, at *5 (S.D.N.Y. Feb. 8, 2019) (citing United States v. Ganim, 510 F.3d 134, 150 (2d Cir. 2007)).

11

against suppression. As such, even if the FBI agent's interview violated Rule 4.2, I find that the drastic remedy of suppression is not warranted.

As a threshold issue, there is a question—both legally and factually—whether the investigation of the alleged $5,000 payment and obstruction, which began in July 2017, constituted the same "matter" for which Mr. Griffin already represented Defendant. The law in this Circuit is far from settled on the question of what constitutes a single "matter" under Rule 4.2 in the criminal context. See, e.g., Simels, 48 F.3d at 647, 650 & 650 n.8 (2d Cir. 1995) (noting that the Second Circuit had not yet "been asked to examine the precise scope of the terms 'adverse interest,' 'party' or 'matter'" and ultimately not deciding the precise scope of the term "matter"). And, factually, Defendant's obstructive conduct involved a new, potentially ongoing, crime, and the investigation into that crime and the alleged $5,000 payment only began in August 2017. Relatedly, depending on the scope of the term "matter," the prosecutors may not have known that Defendant was "represented by another lawyer in the matter." The Court accepts the government's uncontradicted representation that AUSA Treinis-Gatz does not recall listening to Mr. Griffin's voicemail message.[8] Thus, the prosecutors' knowledge of the representation could only be based on their prior interactions with Mr. Griffin, which may have involved a different

---

[8] Defendant did not request a hearing on this or any other issue concerning his motion to suppress for a violation of the ethical rules. And, Defendant has not shown that he is entitled to any discovery—in fact, he has not even requested any specific discovery. Defendant's reply brief only vaguely asserts: "[T]o the extent the Government disagrees with Mr. Walker's factual recitation, the Government should be compelled to produce the evidence that substantiates its recitation of the facts." (Def. Reply Mem. at 6.) In any event, as to the voicemail, Defendant's vague request for discovery, does not, even on its own terms, cover any discovery concerning the voicemail. The government's representation that AUSA Treinis-Gatz does not recall listening to the voicemail message does not "disagree[] with Mr. Walker's factual recitation" about the voicemail, which merely asserts that Mr. Griffin left the voicemail.

matter. In light of the above, I find that suppression is not warranted here even if Rule 4.2 was violated.[9]

In any event, even assuming arguendo that the prosecutor who directed the FBI agents to interview Defendant knew, based on earlier interactions with Mr. Griffin, that Defendant was represented by Mr. Griffin on the same "matter," suppression is still not warranted.

First, it is well established that, absent "the type of egregious misconduct present in Hammad," the fact that the government arranged for a confidential informant to speak to a represented party does not warrant suppression. United States v. Taylor, 17 F. Supp. 3d 162, 173 (E.D.N.Y. 2014); see Nouri, 611 F. Supp. 2d at 385. Given that framework, it would make little sense to suppress statements made by the Defendant to FBI agents who did not act clandestinely and who told Defendant, at the outset of the interview, that he was free to contact his attorney, could refuse to answer questions, and could stop the interview at any time. Cf. In re Amgen Inc., No. 10-MC-0249, 2011 WL 2442047, at *18 (E.D.N.Y. Apr. 6, 2011) (rejecting argument that a "prosecutor is not . . . authorized to have a law enforcement agent conduct an overt interview of a represented investigative target" and reasoning that, inter alia, "while the prosecutorial conduct at issue here may be discourteous to Amgen's counsel, it is certainly no less courteous than the covert use of informants"), report and recommendation adopted, 2011 WL 2418815 (E.D.N.Y. June 14, 2011). There was certainly no egregious misconduct here.

Relatedly, no court in this Circuit, post-Hammad, has concluded that FBI agents, working in conjunction with prosecutors, are not "authorized by law" to interview a suspect prior to

---

[9] For Rule 4.2 to be violated, any communications would also have to be "about the subject of the representation." The concerns identified above relating to the unsettled scope of the term "matter" are similarly applicable to the phrase "subject of the representation." Although Hammad found a violation of DR 7–104(A)(1) based on the particular facts of that case, Hammad did not explicitly address the scope of the term "matter" or the phrase "subject of the representation" in the context of a pre-indictment investigation.

indictment and suppressed evidence on that basis. Such an interview may very well be "authorized by law" given all the circumstances discussed below. Cf. Amgen, 2011 WL 2442047, at *18. In any event, it is unnecessary to definitively resolve this question because even if the government's conduct did violate Rule 4.2, the unsettled nature of the law on this issue is itself a reason to not order suppression as a remedy in this case.

Finally, even if Rule 4.2 was violated, suppression is unwarranted given the circumstances in this particular case. As stressed above, the FBI agents told Defendant, at the outset, that he was free to contact his attorney; he could refuse to answer questions; and he could stop the interview at any time. Additionally, after Defendant stated that he wanted to speak to his attorney, the FBI agents merely showed him certain evidence and advised him, on more than occasion, not to comment. Furthermore, Defendant was a high-level government official, not an unsophisticated suspect. And, given Defendant's allegedly obstructive conduct during his prior interactions with the Contractor, there were legitimate reasons for having the FBI agents question Defendant as part of its investigation into both the payment and the new, potentially ongoing, crime of obstruction. It is also notable that the FBI agents made no effort to invade the attorney-client relationship by seeking privileged information. Thus, even if Rule 4.2 was violated here, based on the facts set forth above, I find, in my discretion, that this is not a case where suppression or dismissal is warranted to remedy any such violation.

### B. Other Arguments Raised in Defendant's Pre-Trial Motions

Defendant's motions to suppress pursuant to the Fifth and Sixth Amendment are also denied. Defendant did not have a Sixth Amendment right to counsel because no charges were pending against him during the events in question, which all transpired between August 2017 and November 2017. See United States v. Holmes, 44 F.3d 1150, 1160 (2d Cir. 1995) ("During the

investigation of an unindicted target, sixth amendment rights do not attach until 'the time that adversary judicial proceedings have been initiated against him.' Because there were no charges pending against [the defendant] . . . and adversarial proceedings had not been initiated against him, there was no interference with Holmes's right to counsel." (quoting Kirby v. Illinois, 406 U.S. 682, 688 (1972)).  Defendant's novel theory based on United States v. Hubbell, 530 U.S. 27 (2000), is unpersuasive.

Defendant's Fifth Amendment argument is similarly meritless.  During the voluntary November 20, 2017 interview conducted at Defendant's house, Defendant was not "'in custody' within the meanings of [Escobedo v. Illinois, 378 U.S. 478 (1964) and Miranda v. Arizona, 384 U.S. 436 (1966)]," (Def. Mem. at 13.).  Additionally, as the government points out, Defendant did not invoke his right to counsel at the outset of the interview and once he did, the FBI agents stopped questioning him and merely showed him evidence from that point forward.  Notably, Defendant's reply brief does not respond to these points and says nothing about Defendant's claim that the statements he made to the FBI agents "should be suppressed as having been obtained in violation of his Fifth Amendment right against self-incrimination."  (Def. Mem. at 13.)

Defendant also seeks to dismiss the indictment, arguing entrapment and impossibility. These arguments are premature and more appropriately raised in a Rule 29 motion after trial. See United States v. Sampson, 898 F.3d 270, 281 (2d Cir. 2018) (explaining that "when a defense raises a factual dispute that is inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that dispute on a Rule 12(b) motion" unless the government has made "a 'detailed presentation of the entirety of the evidence.'"); United States v. Fabian, No. 04-CR-71-01, 2005 WL 2043008, at *6 (D. Vt. Aug. 23, 2005) ("[B]ecause 'the general issue to be tried is

15

the government's inducement and the fact-intensive element of predisposition,' entrapment should not be addressed in a motion to dismiss." (quoting United States v. Labate, 2001 WL 533714, at *9 (S.D.N.Y. May 18, 2001)), report and recommendation adopted, 2005 WL 2205899 (D. Vt. Sept. 12, 2005).

Finally, as to the Kastigar issue, if necessary, the Court will hold a Kastigar hearing after trial.

**SO ORDERED.**

Dated: April 26, 2019
       Central Islip, New York

                                               /s/ (JMA)
                                        JOAN M. AZRACK
                                        UNITED STATES DISTRICT JUDGE