

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NB:JAM
F.# 2016R02202

*610 Federal Plaza*
*Central Islip, New York 11722*

January 29, 2021

By ECF and Email

The Honorable Joan M. Azrack
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Richard Walker
>        Docket No. 18-CR-087 (JMA)

Dear Judge Azrack:

       The government respectfully submits this letter in advance of sentencing in the above-captioned case. On May 29, 2019, the defendant pled guilty to Count One of the indictment, charging Obstruction of Justice in violation of 18 U.S.C. § 1512(c)(2). As delineated in the written plea agreement and described below, the government estimates that the defendant's advisory sentencing range per the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") to be 12-18 months. This is also the same range calculated by the Department of Probation in the Pre-Sentence Investigation Report ("PSR"). See PSR at ¶¶ 46-55. In his January 15, 2021 submission (the "defense submission"), the defendant requests a below-Guidelines sentence of probation.

       For the reasons set forth in the PSR and herein, the government recommends an above-Guidelines sentence of 48 months imprisonment. The Guidelines range is grossly insufficient to address (1) the seriousness of the defendant's conduct, (2) the defendant's flagrant disregard for the law and abuse of his position as a public official, and (3) the need for specific and general deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C). The defendant's brazen use of a government position to enrich himself, tamper with a witness and obstruct justice are factors simply not quantified by the Guidelines. Accordingly, a more severe incarceratory sentence is warranted.

Factual Background[1]

The PSR accurately summarizes the offense conduct.  See PSR at ¶¶ 3-20.

I.      The Indictment and Investigation Overview

On February 20, 2018, a grand jury returned an indictment against Walker.  The indictment charges Walker with: (1) obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2); and (2) making false statements, in violation of 18 U.S.C. § 1001(a)(2).  The indictment resulted from an investigation by the Federal Bureau of Investigation ("FBI") and Internal Revenue Service, Criminal Investigation ("IRS-CI") into whether Walker accepted a payment from a contractor and whether Walker obstructed the investigation and gave false statements to federal law enforcement officials.  See PSR at ¶¶ 3-5.  The indictment alleged that Walker, while holding public office, obstructed or attempted to obstruct a federal grand jury investigation in order to cover-up the fact that, in 2014, he accepted a $5,000 cash payment from a Nassau County contractor ("the Contractor") when he was the Chief Deputy County Executive under Nassau County Executive Edward Mangano.  Id at ¶¶ 5-20.

Specifically, in October 2014, Walker accepted an invitation from the Contractor to attend a University of Notre Dame football game in South Bend, Indiana.  See PSR at ¶¶ 6-7.  While in Indiana, Walker accepted a $5,000 cash payment from the Contractor after the football game, prior to returning to New York.  Id.  In providing Walker the $5,000 – which was delivered at a bar in an envelope – the Contractor stated that Walker had "always been good" to the Contractor.  Walker accepted the envelope.

Walker did not report the $5,000 on his state or federal tax returns.  Nor did he reveal it pursuant to required Nassau County government disclosures.

II.     The Contractor and His Interaction with Walker

Thereafter, in 2017, Walker learned from the Contractor[2] that the United States Attorney's Office for the Eastern District of New York and the FBI had opened a grand jury

---

[1]      This proffer of facts – most of which are summarized in the PSR – is not a complete statement of all facts and evidence of which the government is aware.  Where the contents of recordings, text messages or documents are summarized herein, they are done so in pertinent part and in sum and substance, unless otherwise indicated.

[2]      The Contractor's involvement and eventual cooperation with the government began in or about July 2014, when, unbeknownst to Walker, the Contractor was under federal investigation for tax violations and related crimes.  Prior to making the aforementioned $5,000 payment to Walker, the Contractor had proffered with the government on one occasion, on or about July 23, 2014.  At the next proffer session, on or about February 23, 2015, the Contractor did not disclose the trip to Indiana or the $5,000 payment to Walker.  On or about July 7, 2016, the government issued two subpoenas to two commercial entities controlled by the Contractor, requesting records relating to work performed for various government officials, including

investigation of potential corruption in Nassau County government, including the circumstances surrounding the $5,000 payment made by the Contractor to Walker.  See PSR at ¶¶ 8-20.

On or about and between August 22, 2017 and October 25, 2017, the Contractor recorded numerous telephone, text message and in-person communications with Walker, during which Walker attempted to impede the federal investigation.  Specifically, Walker spoke with the Contractor on several occasions in an attempt to convince the Contractor to conceal the existence of the $5,000 payment from the grand jury.  Id.  Further, Walker urged the Contractor to provide a false explanation to the grand jury concerning both the character of the payment and the reasons for the payment.  Id.   Finally, Walker arranged to meet the Contractor in a park in Hicksville, New York in order to return the $5,000.  The FBI surveilled the meeting, and at the meeting, Walker gave the Contractor an envelope containing $5,000, which was then turned over to law enforcement.  Id.

A.      Walker's Obstructionist Communications with the Contractor

On August 25, 2017, Walker met the Contractor in a park in Hicksville, New York.  See PSR at ¶ 8.  The Contractor informed Walker that he had received a federal grand jury subpoena relating to, inter alia, the aforementioned trip to Notre Dame.  Id.  The Contractor stated that he was concerned about the $5,000 cash payment he had given Walker during the trip.  Id.  In response, Walker asked, "[w]hy don't I just give it back to you?" and told the Contractor that there was "nothing to hide" about the trip and reminding him that they "split expenses" several times in the conversation.  Id.  Walker again stated that he would return the $5,000 and suggestively added that "you only borrowed it and I gave it back to you…there was never a quid pro quo…[you] never said [we] were going to Notre Dame so [you] could get jobs."  Id.  When the Contractor continued to express concern over the $5,000 payment, Walker offered to return $5,000 to the Contractor, so "then [the Contractor does not] have to talk about it."  Id.  Walker added that if he returned the money to the Contractor, it was as if the Contractor "never gave it to [Walker]…so it doesn't exist…wouldn't you rather it not existing?"  Id.

Later that day, Walker and the Contractor engaged in a series of text messages, with Walker continuing to downplay the nature of the $5,000 payment.  See PSR at ¶ 9.  Specifically, Walker noted that the Contractor "lost the contract right after Notre Dame btw [by the way]," apparently attempting to verify that the $5,000 was not a bribe or an unlawful gratuity.  Id.  Walker referred to the federal subpoena as "absolute bullshit" and a "fishing expedition," and told the Contractor that he had discussed the situation with a "friend" at the District Attorney's office.  Id.

The Contractor subsequently called Walker.  See PSR at ¶ 10.  The Contractor explained that he was not "worried about all the legit things…the airline tickets, the stay, the

Walker.  Over a year later, on or about July 14, 2017, the Contractor proffered with the government and – for the first time – disclosed the $5,000 payment to Walker.

dinners...It's the cash that's concerning me." Id.  The call was then disconnected, with Walker apparently hanging up.  Immediately thereafter, Walker sent a series of text messages to the Contractor, claiming that he was on a train and could not hear the call.  Id.  Walker then texted the following:

> None cash
> Zero
> ....There is nothing else I'll have it tomorroo [sic]
> Then there isn't anything else
> Thank you
> Done
> U helped me pay for mother in law cancer stuff much appreciated
> Where u be tommorroo [sic] end of story p [sic]
> I want u to be comfortable and not have to say something immaccurate [sic].

Id.

   In another phone call, the Contractor again expressed concern about the investigation and asked Walker about the potential ramifications if the Contractor was not truthful.  See PSR at ¶¶ 11-12.  Walker responded, "[t]he truth is we went away. I'm not hiding we went away together.  Fuck 'em. I don't give a fuck.  I have nothing to hide about that. So, that's it. That's the end of the story."  Id.  Walker assured the Contractor that he would "take care of the other things."  Id.  A short time later, Walker called the Contractor and inquired whether the Contractor was available the following day so Walker could "drop that off," referring to $5,000 cash.  See PSR at ¶ 13.

   B. The August 29, 2017 Meeting

   On August 28, 2017, the Contractor received a text message from an individual ("Individual 1").  See PSR at ¶ 14.  Individual 1 was mutual acquaintance of Walker and the Contractor and asked the Contractor to meet him the following day.  Id.  The two arranged to meet in Hicksville, where Individual 1 handed the Contractor an envelope that appeared to contain cash, stating that it was from Walker.  Id.  The Contractor declined to accept the envelope and told Individual 1 that he would contact Walker directly.  Id.  The Contractor then called Walker and expressed concerns about Walker involving a third party in the transaction. Id.  Walker stated he did so to make the Contractor feel "comfortable."  Id.

C.     The September 6, 2017 Meeting

On September 6, 2017, Walker and the Contractor met again in a park in Hicksville. See PSR at ¶ 15. The Contractor queried why Walker involved Individual 1 in the situation, to which Walker responded that he "just want[ed] to give it to you so it's done. Never existed. I borrowed it from you. That's it." Id. The Contractor then told Walker that he had been advised by an attorney that he would have to be truthful when providing grand jury testimony, Walker stated, "[j]ust be honest. I borrowed the money from you. I gave it back to you…It had nothing to do with Notre Dame. My mother-in-law was sick…it's over." Id. Walker further advised the Contractor that if he felt that he had to tell his attorney, the Contractor should "be honest," and say that he did not remember when the money was borrowed or returned. Id. Walker reiterated that he would return the money, and added that he would rather not drop the money off himself, in the event that "someone [is] watching." Id.

D.     The September 20, 2017 Meeting

After arrangements were made via text message, Walker and the Contractor met on September 20, 2017 in a Hicksville parking lot. See PSR at ¶ 16. During the meeting, Walker gave the Contractor an envelope with $5,000 in cash. Id. When the Contractor asked Walker if he told anyone about the money, Walker replied, "No, it doesn't exist. That's it." Id. The Contractor asked, "So, I'm not saying a word [to the Grand Jury]?" and Walker replied, "[n]ope, doesn't exist." Id.

III.     Walker's False Statements to Law Enforcement

On or about November 20, 2017, FBI agents attempted to interview Walker at his home. See PSR at ¶¶ 17-20. The interview lasted approximately 15 minutes. Id. At the outset, Walker was advised by the agents that they wanted to interview him regarding his relationship with the Contractor. Id. Walker agreed to be interviewed and denied, inter alia, that he had ever received money from the Contractor. Id. The agents then confronted Walker with some of the aforementioned recordings with the Contractor; Walker stated that he did not know what "cash" was being referred to in those communications. Id. Walker then volunteered that he was "not hiding that we [he and the Contractor] went away together. Fuck em." Id.

IV.     Other Relevant Conduct

Title 18, United States Code, Section 3661 directs the Court to consider all relevant conduct and information about the defendant when sentencing him or her: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." As a result, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988); see also Pepper v. United States, 562 U.S. 476, 488 (2011) (courts are permitted under Section 3661 to "consider the widest possible breadth

of information about a defendant."); <u>United States v. Wernick</u>, 691 F.3d 108, 118 (2d Cir. 2012) (recognizing district court discretion to consider a "broad range of information" in evaluating sentencing factors); <u>United States v. Shine</u>, No. 17-CR-28- FPG-JJM, 2020 WL 32937, at *1 (W.D.N.Y. Jan. 2, 2020) (declining to strike a victim impact statement and noting that it was "vested with broad discretion to consider information pertinent to Defendant, even if it is collateral to his offense of conviction.").

   The government submits that the following relevant conduct should be considered by the Court at sentencing.  <u>See</u> PSR at ¶¶ 28-31.

- In or about and between 2012 and 2015, the defendant received over $250,000 from Friends of Ed Mangano ("FOEM") bank accounts to pay off charges on his personal credit card.  Indeed, in 2014 alone, over $120,000 of FOEM funds were used to pay the defendant's personal credit card expenses.  No receipts or underlying documentation were provided in support of these transactions.  When subpoenaed, the treasurer and account signatory for the FOEM account ("Individual 2") refused to cooperate with law enforcement and, through counsel, invoked the Fifth Amendment privilege.

- In or about April 2012, the defendant helped an individual ("Individual 3") set up a private consulting firm.  Individual 3 was a Nassau County employee who worked for the defendant as his Special Assistant from 2010 until 2012, and had also previously worked for the defendant when he served as a New York State Assemblyman.  As a former county employee, Individual 3 was barred from obtaining or bidding on county contracts directly.  Nevertheless, Individual 3 won several contracts from the Friends of Nassau County Recreation ("FONCR") and the Hicksville Republican Club ("HRC"), two organizations with which the defendant had significant influence and leadership positions.  When Individual 3 received money pursuant to these contracts – typically in installments of $5,000-10,000 – Individual 3 deposited a check and, within a day, withdrew half of the amounts in cash.  Approximately $64,000 was withdrawn in this manner in or about and between January 2015 and October 2015.  Individual 3 refused to cooperate with law enforcement and, through counsel, invoked the Fifth Amendment privilege.[3]

- In or about 2014, a Nassau County entity ("Company 1") made approximately $3,000 in donations to the HRC immediately prior to being awarded a government contract to remove debris left by Hurricane Sandy.  Company 1 was incorporated two days before the county sought bids on the contracts.  The defendant claimed that he did not solicit the money from Company 1.  However, the defendant references the federal

---

[3]   It is notable that, despite refusing to cooperate or speak with the government, Individual 3 appears to readily have spoken with defense counsel about Individual 3's banking practices and relationship with the defendant in preparation for the defendant's sentencing submissions.

investigation into Company 1 and the aforementioned payments to the HRC in recorded conversations with the Contractor.

- In 2018, the defendant acted as a "volunteer advisor" on a campaign for a congressional candidate ("Candidate 1"). The defendant hired an individual ("Individual 4") to perform printing work on behalf of Candidate 1. Candidate 1's campaign paid Individual 4 approximately $125,000 in or about and between October and November 2018. During the same time period, Individual 4 issued three checks totaling $12,000 to Cooper Hudson Consulting, one of the defendant's businesses.

<u>Sentencing Range and Guidelines Calculation</u>

Count One, Obstruction of Justice, carries a maximum possible term of imprisonment of 240 months. The government submits that the Guidelines calculation set forth below and outlined in the PSR should be applied, which results in a total offense level of 13. <u>See</u> PSR at ¶¶ 46-55. This level carries a range of imprisonment of 12 - 18 months, assuming that the defendant falls within Criminal History Category I.

| | |
|---|---|
| Base Offense Level (§ 2J1.2(a)) | 14 |
| Plus:   Abuse of Position of Trust (§ 3B1.3) | +2 |
| Adjustment for Acceptance of Responsibility | -3 |
| Total Offense Level: | <u>13</u> |

Both the government and the PSR apply the two-point enhancement for abuse of a position of trust. <u>See</u> U.S.S.G. § 3B1.3. "Public trust" refers to a position "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." <u>Id.</u> at Application Note 1. The Guidelines note that "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." <u>Id.</u> Clearly, the defendant's high-ranking position in Nassau Country government and the significant influence he wielded over procurement is what led the Contractor to offer the defendant a cash payment. <u>See</u> PSR at ¶ 26. Similarly, the defendant leveraged his authority to pressure the Contractor to commit perjury by claiming that the transaction "never happened." <u>Id.</u> As such, Walker's public position not only "significantly facilitated the commission of the offense," it is inextricably linked to it. <u>See</u> U.S.S.G. § 3B1.3, Note 1.

<u>The Defendant is Not a Cooperating Witness and Deserves No Downward Departure of
Variance On That Basis</u>

    In the defense submission, the defendant claims that his participation in <u>United
States v. Skelos</u>, 15-CR-317 (KMW), which occurred in the Southern District of New York
and concluded in July 2018, justifies a downward departure.  Characterizing himself as a
"cooperating witness," the defendant asserts that he provided "substantial assistance" to the
government in <u>Skelos</u> and deserves credit pursuant to U.S.S.G. § 5K1.1.  <u>See</u> Defense
Submission, pp. 8-9.

    The defendant was not a "cooperating witness" in any sense of the term, either
legal or colloquial.  Far from cooperating with the government's investigation in <u>Skelos</u>, upon
learning he was under federal investigation, the defendant refused to speak with law
enforcement – even with the protections of a proffer agreement – and required a formal grant
of immunity.  Even then, while most cooperating witnesses plead guilty to or otherwise
acknowledge illegal conduct as part of their cooperation, the defendant refused to answer any
questions beyond the limited scope of his expected testimony.  He had no cooperation
agreement with the government and had to be compelled to testify at trial.  Under these
circumstances, the defendant cannot be considered a "cooperating witness."  <u>See</u> <u>United States
v. Hon</u>, 17 F.3d 21 (2d Cir. 1994) (government did not breach cooperation agreement by failing
to move for downward departure under Section 5K1.1 where defendant had to be compelled
to testify and forced the government to obtain an immunity order before testifying against co-
defendant).

    Indeed, to adopt the defendant's criterion for cooperation would render almost
any witness a cooperator entitled to Section 5K1.1 credit.  Regardless, the government has
conferred with the <u>Skelos</u> prosecutor, who acknowledged that while the defendant's testimony
was useful in that it was corroborative of other evidence, it did not rise to the level of
"substantial assistance" warranting Section 5K1.1 consideration.[4]

    As such, the government declines to move for a downward departure on this
basis.  <u>See</u> <u>United States v. Difeaux</u>, 163 F.3d 725, 728 (2d Cir. 1998) (quoting § 5K1.1 and
noting a departure based on substantial assistance can *only* be made "upon motion of the
government.") (emphasis added); <u>United States v. Huerta</u>, 878 F.2d 89, 93 (2d Cir. 1989)
(rejecting constitutional challenge and noting that "whether a defendant's cooperation has risen
to the level of 'substantial assistance' to the government is self-evidently a question that the
prosecution is uniquely fit to resolve.").  This decision is fully compliant with due process,
made in good faith, and the defendant cannot and does not allege otherwise.  <u>See</u> <u>United States
v. DeRiggi</u>, 45 F.3d 713 (2d Cir. 1995) (government's good faith refusal to make motion for
downward departure for substantial assistance is not permissible grounds for departure by

---

[4]   Given the <u>Kastigar</u> litigation attendant to the instant case, the undersigned
prosecutor has not reviewed the defendant's trial testimony or any other substantive records
related <u>Skelos</u>.

sentencing court); United v. Mkhsian, 5 F.3d 1306 (9th Cir. 1993) (claim the defendant provided substantial assistance warranting downward departure will not entitle defendant to a remedy or even to discovery or an evidentiary hearing; defendant must make a showing that government's refusal to file Section 5K1.1 motion was predicated on unconstitutional motive such as race, religion or otherwise not rationally related to any legitimate government end).

In the absence of a government motion, the Court may not consider the defendant's professed "cooperation" as a basis for a departure.  See United States v. Gonzalez, 970 F.2d 1095, 1102-3 (2d Cir. 1992) ("[t]his Court has made clear that downward departures based on "substantial assistance" to the Government may be made only where the Government has moved pursuant to section 5K1.1.") (collecting cases).  Nor should the Court consider the defendant's participation in Skelos in its analysis pursuant to 18 U.S.C. § 3553(a) – his conduct was far more recalcitrant than cooperative.

### Factors Warranting an Above-Guidelines Sentence

Several factors militate in favor of a substantial upward departure.  See PSR at ¶ 100 ("apart from the conduct for which he was held accountable for Guidelines purposes, the defendant was involved in a myriad of other conduct.").  As these and other factors also weigh in favor of the upward variance advocated by the government herein, they are discussed concurrently below.  See generally Gall v. United States, 522 U.S. 38 (2007) (variance outside the Guidelines range should occur after consideration of all relevant departure provisions); United States v. Chase, 560 F.3d 828 (8th Cir. 2009) (departure precedents do not bind district courts with respect to variance decisions, but may be considered persuasive authority); United States v. McIntyre, 531 F.3d 481 (7th Cir. 2008) (post-Booker, district courts need not follow § 4A1.3 when imposing an above-guidelines sentence, but must provide a statement of reasons consistent with section 3553(a)).

First, the two-point enhancement for abuse of a position of trust fails to account for the defendant's brazen misuse of his government position.  The defendant was not simply an ordinary official, but rather the second highest ranking individual in Nassau County government, who oversaw millions of dollars in procurement, hiring and other municipal undertakings.  This is far more than the "professional or managerial discretion" that triggers the Guidelines enhancement.  Relatedly, the defendant is able to avoid an upward adjustment for Obstructing or Impeding the Administration of Justice pursuant to U.S.S.G. § 3C1.1, as he "did not engage in further obstructive conduct" beyond the res gestae of the charged crime.  See PSR at ¶ 26.  As such, his conduct is not captured by his offense level and demands greater weight from the Court at sentencing.  See United States v. Kaye, 23 F.3d 50, 53 (2d Cir. 1994) (affirming upward departure where Guidelines did not capture the proper degree of harm or consequences of criminal conduct).

Second, there is no question that the Contractor provided the $5,000 payment to Walker with the tacit understanding and expectation that Walker would use his position to benefit the Contractor's business endeavors in the future.  While the idiosyncrasies of the payment may not meet the statutory definition of a bribe, the defendant was certainly aware of

its inappropriate and arguably unlawful character, which is why he omitted it from his tax returns, failed to disclose it on Nassau County government financial and conflict of interest disclosures, and attempted to hide it from law enforcement by asking the Contractor to conceal it. Thus, the initial acceptance of the money from the Contractor is an uncharged bad act that supports an upward variance. See U.S.S.G. § 5K2.21.

Similarly, the instant offense was not aberrational. As described in the PSR and herein, the defendant has been involved in a "myriad of other conduct" involving the apparent abuse of his position, further justifying a variance. See PSR at ¶ 100.

Argument

In this case, the government's recommended above-Guidelines sentence of 48 months' imprisonment is warranted to address (1) the seriousness of the defendant's conduct, (2) the defendant's disregard for the law and abuse of his position as a government official, and (3) the need for specific and general deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).

A.    The Seriousness of the Offense Mandates a Substantial Upward Variance

The severity of the defendant's conduct in this case cannot be overstated: while serving as the second most powerful official in Nassau County, Walker accepted an improper payment from the Contractor and then endeavored to obstruct a federal grand jury investigation to cover it up. In doing so, Walker knowingly and intentionally attempted to have the Contractor flout a subpoena in a criminal investigation and suborn perjured testimony in the grand jury. Walker was clearly aware that his conduct was criminal. The circumspect language he used in text messages and phone calls; the clandestine meetings he orchestrated in parks and parking lots; and his use of a third party to deliver an envelope of cash all show consciousness of his own guilt. Indeed, Walker comported himself more like a mafia soldier rather than a Deputy County Executive in committing the charged offense. Such behavior evinces a total disregard for the law and a complete betrayal of his public office that is simply not accounted for by the Guidelines.

B.    The Defendant's Uncharged Relevant Conduct is Significant

As stated previously, the offense conduct appears to be only one example of how Walker used his office to enrich himself. As described herein and in the PSR, Walker appears to have used his position and political connections to enrich himself in a variety of way and on a variety of occasions. Thus, to impose a Guidelines sentence and simply dismiss the offense conduct as an anomaly would ignore numerous other instances of apparent malfeasance and undermine respect for the law.

C.     Nothing in the Defendant's Background Provides Compelling Mitigation

The circumstances of the defendant's upbringing, family structure, and lack of criminal history, should certainly be considered, but they must also be balanced with the nature and gravity of the instant offense. See PSR at ¶¶ 62-76. In fact, the defendant's intelligence, education and ability to influence others through his political position make his crime all the more inexcusable. Rather than being borne out of necessity or adverse circumstances, the defendant's criminality was motivated out of hubris and pure greed. The factors in favor of an upward variance are far more significant than any mitigating circumstances in the defendant's background.

Congress, through the Guidelines, has addressed and rejected arguments from privileged defendants who lament the collateral consequences of conviction as applied to them. See 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to…socioeconomic status of offenders."); U.S.S.G. § 5H1.10 (socioeconomic status not relevant); see also U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant). Courts have agreed. See, e.g., United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); United States v. Musgrave, 761 F.3d 602, 608–09 (6th Cir. 2014) (impermissible for the district court to rely heavily on the fact that the defendant had already "been punished extraordinarily" through years of legal process, the loss of his CPA license, and his felony conviction). As the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999). The suggestion that the defendant or any person from a privileged background should receive a lesser sentence than others due to "reputational harm," "professional harm," or "lost business opportunities" is simply wrong and this Court should reject it.

D.      The Defendant Continues to Minimize His Conduct

While the government is not contesting the downward Guidelines adjustment for acceptance of responsibility, the defendant refuses to acknowledge the full criminal scope of his conduct.  Specifically, the defendant continues to assert that the offense stems from his "personal relationship" with the Contractor, and that his receipt of $5,000 from the Contractor was "unsolicited" and meant to "even things out" at the conclusion of their vacation.  Nothing could be further from the truth – this payment was not a "cash reimbursement" of any kind, but rather in consideration for past and future benefits the defendant would provide to the Contractor in his official capacity.  Indeed, this reality is precisely why the defendant sought to obfuscate and hide the fact of the payment from law enforcement.

The defendant's recalcitrance on this key issue deserves serious consideration by the Court.  See United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (stating that defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct…further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); accord United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014) (summary order).

E.      The Need for Both Specific and General Deterrence is High

A substantial sentence is necessary to deter not only the defendant, but similarly-situated individuals from engaging in such behavior.  Because the instant offense involved "rational, cool, and calculated" decision making, rather than "sudden crimes of passion or opportunity, [it is a] prime candidate for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted).  The defendant engaged in deliberate, premeditated conduct, making the instant offense ideal for both general and specific deterrence.

Additionally, a heavy sentence is necessary to deter others who would abuse their official position for their own personal ends. This type of criminal conduct erodes the public's trust of its government, particularly on Long Island, where corruption in local government is endemic.  Thus, it is critical that this defendant's sentence clearly communicate that such abuses will not be tolerated.

Furthermore, to sentence the defendant within the Guidelines would actually embolden those who wish to tamper with witnesses or otherwise obstruct law enforcement and grand jury investigations.  It would signal to similarly situated-individuals that the potential benefit for such criminal conduct is high and the risk, if discovered, is relatively low.  Thus, absent a considerable upward variance in this case, the defendant's conduct would provide a blueprint to those who would engage in and solicit similar obstructive conduct.  Accordingly, a Guidelines sentence would encourage, rather than deter, similar behavior in the future.  The Court must therefore apply an upward variance to ensure a sufficient deterrent message is sent.

F.     The Proposed Upward Variance Would Not Be an Abuse of Discretion

A 48 month sentence would not be an abuse of the Court's discretion at sentencing.  The substantive reasonableness of any sentence – whether within or outside the Guidelines – is reviewable under an abuse-of-discretion standard. See Gall v. United States, 522 U.S. at 59 (2007) (noting that "if the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness…. but if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness"). Indeed, the Court has tremendous latitude in fashioning a just sentence, and deference is given to any "decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id. ("[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court").

Here, given the case-specific factors outlined above, the recommended 48-month sentence is well within the Court's broad discretion.  See, e.g., United States v. Erpenbeck, 532 F.3d 423 (6th Cir. 2002), certiorari denied 555 U.S. 997 (sentence of two concurrent terms of 300 and 60 months for bank fraud and obstruction of justice convictions, which represented an upward variance of 65 months from the Guidelines range, was not substantively unreasonable; district judge explained that an above Guidelines sentence was proper in light of the fact that the suffering and harm was not otherwise accounted for in defendant's sentencing); United States v. Mills, 917 F.3d 324 (4th Cir. 2019) (district court's application of statutory sentencing factors supported its conclusion that variance to 70-month sentence – almost double the estimated Guidelines – for being felon in possession of firearm was necessary to satisfy basic aims of sentencing.  Court considered the defendant's criminal history and particularly dangerous nature of circumstances involved in the charged offense); United States v. Martinez-Armestica, 846 F.3d 436 (1st Cir 2017), certiorari denied 138 S.Ct. 64 (upward variance of 25 months not substantively unreasonable where district court considered statutory sentencing factors to distinguish defendant from ordinary brandisher of firearm); United States v. Lente, 759 F.3d 1149 (10th Cir 2014) (district court's decision to vary upward from defendant's 46-57 month advisory Guidelines range and impose a 192-month sentence for involuntary manslaughter and assault resulting in serious bodily injury was substantively reasonable given the extreme recklessness of the act and resulting death).

Considering the totality of the circumstances delineated in 18 U.SC. § 3553(a), the proposed upward variance is well within the range of "permissible decisions."  United States v. Ingram, 721 F.3d 35, 43 (2d Cir. 2013) (when reviewing sentence for substantive reasonableness, Court of Appeals will not substitute its own judgment for district court on the question of what is sufficient to meet statutory sentencing considerations in any particular case, but will instead set aside district court's substantive determination only in exceptional cases in which district court's decision cannot be located within the range of permissible decisions).

<u>Conclusion</u>

For the reasons set forth in the PSR and herein, the government recommends an upward variance and an above-Guidelines sentence of 48 months' imprisonment. This sentence is sufficient, but not greater than necessary to achieve the goals of sentencing, <u>see</u> 18 U.SC. § 3553(a)(2). The Guidelines simply do not quantify or capture the nature and gravity of the offense conduct, which represents a shocking disregard for the law by an influential public official.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:     /s/ _____
Artie McConnell
Assistant U.S. Attorney
718-254-7150

cc:   Brian Griffin, Esq. (by ECF)
Lisa Langone, United States Probation Officer (by E-mail)

14